AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia



JUN 30 2017

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

CELLULAR DEVICE: iPhone, Model #:MN8P2LL/A;
S/N: F71SJF9CHG74; IMEI#:35 916407 784048 7

)
)
)
)
)

Case No. 3:17SW141

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
CELLULAR DEVICE: White and Rose colored iPhone, Model #:MN8P2LL/A; S/N: F71SJF9CHG74; IMEI#:35 916407 784048 7, currently located in the ATF, Richmond I Field Office, Evidence Vault in North Chesterfield, VA.

located in the                Eastern            District of                Virginia                , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 922(a)(6) | Make a false statement to a FFL in relation to a firearm purchase; Possession of a |
| 18 USC § 922(g)(3) & 922(k) | firearm by a drug user; Possess firearm w/obliterated serial number; Lying to a |
| 18 USC § 1001 | Federal Agent. |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

John C. Donovan, ATF Special Agent

*Printed name and title*

Sworn to before me and signed in my presence.

Date:  June 30, 2017

/S/
David J. Novak
United States Magistrate Judge
*Judge's signature*

City and state:  Richmond, Virginia

*Printed name and title*

## **ATTACHMENT A**

1.      All records on the SUBJECT DEVICE that relate to violations of Title 18 United States Code, Sections 922(a)(6), 922(g)(3), 922(k), and 1001 including:

    a.  Notes, ledgers, messages, and similar records relating to the transportation, ordering, purchasing, and distribution of firearms.

    b.  Address books, phone books, applications ("Apps"), and similar records reflecting names, addresses, telephone numbers and other contact or identification data.

    c.  Applications and records relating to firearm trafficking income, and expenditures of money and wealth, including bank records.

    d.  Calendars, applications, and other records referencing meetings, schedules, and interstate and foreign travel.

    e.  Digital photographs, videos, or audio recordings of confederates, assets or controlled substances, the spending of firearm's proceeds, and specific locations connected to the user of the phone.

    f.  Stored communications, including text messages, MMS messages, and voicemails.

    g.  Any subscriber or owner information for the cellular telephones.

    h.  Any cellular telephone records, and telephone books or lists, or receipts relating to the acquisition and purchase of cellular telephones, or minutes purchased or applied to cellular telephones.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2.      Evidence of user attribution showing who used or owned the listed phones at the time the things described in this warrant occurred, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, John Donovan, depose and say as follows:

1.      I am a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since November 2016.  Prior to that date, I was an Officer in the U.S. Navy from 2002 until 2012 on Active Duty and from 2012 until the present I have been serving in the Navy Reserve.  I am a graduate of the U.S. Naval Academy in Annapolis, MD where I earned a Bachelor's Degree in Mechanical Engineering.  Since working for the ATF, I graduated from the 12-week Criminal Investigator Training Program at the Federal Law Enforcement Training Center located in Glynco, Georgia.  In addition, I also graduated from the 15-week ATF Special Agent Basic Training, which is also located in Glynco, Georgia.  The training consisted of investigating firearms trafficking and detection of controlled substances trafficking.  I have reviewed numerous arrest and search warrants/affidavits from investigations involving the unlawful possession, illegal use of and trafficking in firearms in violation of Title 18, United States Code Section 922.  Through my training and experience, I am familiar with aspects of the drug and firearm trafficking within the jurisdiction of this Court.

2.      Unless otherwise stated, the information in this affidavit is either personally known to me or was provided to me by other law enforcement officers (collectively referred to as "Agents").  Information provided by other law enforcement officers is believed by me to be accurate and truthful.  This affidavit is not intended to include each and every fact and matter known to the government.

3.      Your affiant knows from his training that firearm and drug related offenses, that individuals who traffic in firearms and controlled substances utilize cellular telephones to further

1

their illegal enterprise. Your affiant knows that these individuals often communicate by both

wire and electronic means. Your affiant knows that traffickers store contact names, nicknames,

phone numbers and photographs within their cellular telephones. Your affiant knows that

traffickers often utilize prepaid, anonymous cellular services or cellular telephones subscribed to

by third parties, and will often store the following items on these cellular devices:

      a.  contact lists

      b.  text messages

      c.  call logs to include incoming, outgoing, dialed, and missed calls

      d.  photographs

4.      Your affiant has probable cause to believe that within the cellular telephone listed below,

there is presently concealed those items listed above which constitute evidence of violations of

18 U.S.C. § 922(a)(6), 18 U.S.C. § 922(g)(3), 18 U.S.C. § 922(k), and 18 U.S.C. § 1001.

**CELLULAR TELEPHONE FOR WHICH SEARCH WARRANT IS REQUESTED**

- **CELLULAR DEVICE: A white and rose colored iPhone with the Model Number: MN8P2LL/A; S/N: F71SJF9CHG74; IMEI Number: 35 916407 784048 7; and MEID Number: 35916407784048.**

The applied-for warrant would authorize the forensic examination of the SUBJECT

DEVICE for the purpose of identifying electronically stored data particularly described in

Attachment A.

**TECHNICAL TERMS**

Based on my training and experience, I use the following technical terms to convey the

following meanings:

2

a. **Wireless telephone**: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. **Digital camera**: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. **Portable media player**: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or

3

photographic files.  However, a portable media player can also store other digital data. Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  **IP Address**: An Internet Protocol Address (or simply "IP Address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer connected to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

e.  **Internet**: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

Based on my training and experience, I know that cellular phones have capabilities that allow them to serve as a wireless telephone, a portable handheld computer, digital camera, portable music/media player, and send emails and/or text messages.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

4

## FACTS SUPPORTING PROBABLE CAUSE FINDING

1. On June 15, 2015, QUAASHIE AMAR WISE [WISE] purchased a Smith & Wesson, Model SD 9, 9mm semi-automatic pistol bearing serial number HEU 4037 and a Smith & Wesson, Model SD 40, .40 caliber semi-automatic pistol bearing serial number FWS 3815, from a Virginia federally licensed firearms dealer [FFL].

2. On January 25, 2016, WISE purchased a Taurus, Model PT 111M, 9mm semi-automatic pistol bearing serial number TIZ16513, from a Virginia federally licensed firearms dealer [FFL].

3. On October 14, 2016, WISE purchased a Glock, Model 23, .40 caliber semi-automatic pistol bearing serial number ZYA 840 and a Glock, Model 19, 9mm semi-automatic pistol bearing serial number ACCE 464, from a Virginia federally licensed firearms dealer [FFL].

   On October 16, 2016, WISE purchased a Sccy, Model CPX1, 9mm semi-automatic pistol bearing serial number 422685 and a Del-Ton, Model DT-15, 5.56 caliber semi-automatic rifle bearing serial number DTI-S101746, from a Virginia federally licensed firearms dealer [FFL].

4. On October 24, 2016, WISE purchased another Sccy, Model CPX1, 9mm semi-automatic pistol bearing serial number 415616, from a Virginia federally licensed firearms dealer [FFL].

5. On October 31, 2016, at approximately 1400 hours, ATF Special Agent (SA) Nasir Sessoms conducted an interview of RB, Sales Clerk of (FFL) Dance's Sporting Goods, located at 570 Southpark Boulevard, Colonial Heights, VA 23834. RB Stated that WISE had recently been coming to the store on a frequent basis and purchased multiple firearms. RB noted that during WISE's most recent purchase, he had a large amount of cash on him, primarily in small denominations of US currency. RB also noted that the cash smelled strongly of marijuana.

6. SA Sessoms asked RB what alerted her to WISE. She stated she noticed WISE had started coming into the store more recently and frequently. She also remembered WISE coming in the store on October 14, 2016. On that day, he put two firearms on layaway. WISE returned approximately a week later and purchased the two firearms.

7. On the October 31, 2016, at approximately 1430 hours, SA Sessoms interviewed MD, Sales Clerk of (FFL) Dance's Sporting Goods. MD stated she knew one of WISE's associates by the name of Bruce, but didn't know his last name. MD stated that Bruce LNU was with WISE in the store on October 23, 2016. On that same day, the NICS check for WISE was delayed. WISE left the store and returned the next day and purchased firearms. She remembers WISE, Bruce LNU, and the cash used to purchase the firearms all smelled like what she believed to be marijuana.

8. Investigation has determined WISE had made material false statements on the firearm purchase forms for the purchases set forth above.

6

9. In reviewing his Virginia Computerized Criminal History as of November 1, 2016, WISE has been arrested nine times. He has a mixture of felony and misdemeanor arrests, but only three misdemeanor convictions. As of November 2, 2016, WISE's wage records showed a total of $640.33 for the first quarter of fiscal year 2016 in Virginia.

10. On November 21, 2016, Agent T. Fleming with the Bureau of Alcohol, Tobacco, Firearms and Explosives, along with Detective R. Ferguson of the Petersburg Bureau of Police went to Petersburg Lofts Apartments located at 214 North Dunlop Street and in speaking with management, learned that WISE moved into Apartment 108 on October 1, 2014 and was evicted on September 30, 2015. Management advised that WISE left the Apartment with a lot of damage when he moved out.

11. The officers then went to BECO Asset Management located at 1200 Harrison Creek Boulevard, Petersburg, Virginia and learned that WISE moved into Apartment 7308 on August 9, 2013 and moved out on August 8, 2015. WISE's account did not leave a forwarding address and did not show any employment information.

12. On November 21, 2016, Agent Fleming along with Detective R. Ferguson met with WISE inside of Dance's Sporting Goods. WISE was there in order to initiate the purchase of an AK style pistol. WISE put the firearm on lay-a-way with the intention of completing the purchase at a later date. Agent Fleming identified himself to WISE. When asked where he lived, WISE falsely stated that he lived at 214 North Dunlop

Street, Apartment 108 in Petersburg, Virginia. When asked where his firearms were, WISE falsely said the guns were in Apartment 108.

13. Agent Fleming advised WISE that he was being untruthful about where he lived because the officers had already been there and in speaking with office personnel at the complex, learned that WISE moved into apartment 108 on October 1, 2014 and was evicted on September 30, 2015. It was further learned that WISE left the apartment damaged when he moved out. Agent Fleming told WISE that he was not living in apartment 108. WISE then falsely said he was living back and forth. When asked where he resided, WISE refused to provide an address. He would only say that he was living on Crater Road and that now was not a good time to talk with the officers as he had to get to class at Virginia State University (VSU). On that date he was served a "Warning Notice of Straw Purchasing" Letter, which addressed putting the incorrect information on ATF Form 4473.

14. Arrangements were made for WISE to call Agent Fleming on the following day (November 22, 2016) in order for the officers to be able to speak with WISE about the firearm purchases that he had recently made.

15. On November 22, 2016, WISE called Agent Fleming and stated that he would bring all of his purchased firearms to Dance's Sporting Goods to meet with the Agent. At approximately 1:00PM, WISE called Agent Fleming to report that he was inside of Dance's Sporting Goods and had all of his recently purchased firearms with him.

8

16. Agent Fleming and Agent B. Kcraget met with WISE at Dance's Sporting Goods. WISE was carrying the box that the Delton AR Rifle he purchased came in and said that all of his firearms were in the box. WISE was told that he was not under arrest and was free to leave. WISE stated that he wanted to clear this up.

17. Upon examining the firearms, all recent purchases were accounted for. One firearm, a Taurus, Model PT 111 Millennium G2, 9mm semi-automatic pistol, had a serial number on the frame that had been scratched out which made the serial number illegible. WISE said he could read it. Agent Fleming used a magnifying glass, but was unable to read it. Two firearm's sales-persons at Dance's were asked if they could read it; they also said that they could not read it. There was a matching serial number on the slide of the firearm, which was TIZ16513. An attempt had also been made to scratch through that serial number, but it was still legible. The serial number on the slide matched the serial number on the ATF Form 4473 pertaining to the purchase of the firearm by WISE on January 25, 2016.

18. Due to the firearm serial number being obliterated, the firearm was taken into ATF custody. As Agent Fleming was filling out the Receipt for Property, WISE was asked for his address in case he was able to have the firearm returned to him. WISE provided an address of 200 Addison Way, Apartment # 9, Petersburg, Virginia and a phone number of 301-885-9322.

19. Agent Fleming addressed WISE putting the incorrect address on the ATF Form 4473 that he was filling out with each firearm purchase.  WISE said he took his name off of the lease at some point, but falsely stated he still stayed at the 214 N. Dunlop Street apartment and still got mail there.  He reported that two "female peers" live there now, but he refused to provide their names.  WISE falsely stated that he had been staying back and forth and only moved out seven months ago.

20. On November 22, 2016, Agents Fleming and Kcraget advised WISE of the consequences of putting the wrong address on the ATF Form 4473 and informed him that he was violating United States Code Sections 18 USC 922(a)(6) and 18 USC 924(a)(1)(A), both of which are felonies.

21. On December 12, 2016, WISE returned to Dance's Sporting Goods and filled out the ATF Form 4473, along with the Virginia State Police S.P. 65, in order to purchase the firearm that he had previously put on lay-a-way on November 21, 2016.  For his current address, WISE falsely wrote down 214 Dunlop Street, Apartment 108, Petersburg, Virginia.  Agent Fleming knew that address to be incorrect and knew that WISE had not lived at that address in well over a year.  WISE signed the ATF Form 4473 on this date falsely affirming that all information was true and correct.

22. When the agents got to Dance's Sporting Goods December 12, 2016, WISE was not at the store.  WISE had left pending the firearm sale approval going through.  After Dance's

10

received the approval from the Virginia State Police, they called WISE to inform him that he could return to the store to complete the transaction and pick up the firearm. A short time later, WISE pulled into the parking lot driving a white 2015 Nissan Altima four door bearing Washington, DC registration EZ 9977. In addition to WISE being the driver, the vehicle was occupied by three other passengers. This was known to be the vehicle driven by WISE as it was the same vehicle that he was driving on November 21, 2016. WISE backed into a parking space, got out of the vehicle and went into the store. After a few minutes, WISE came out. As he exited the store with the firearm in the box and the box in hand, Agent Fleming approached.

23. Agent Fleming spoke with WISE and advised him that the approval had gone through, but since he had put the wrong address on the ATF Form 4473, he had just committed two federal felonies, even after having been cautioned against doing so on November 22, 2016. WISE stated that he knew the agents had spoken with him about that, but he had already put the gun on lay-a-way and the store has a policy of no refunds so he could not get his money back. WISE indicated that he bought the gun with the intention of leaving the store with it, then getting all of his guns together and returning to the store with them so he could sell all of them back to the store so he could use the money to move. WISE stated that he had tried to call Agent Fleming to talk about it, but did not get an answer. WISE said he called from a 202 area code phone number. WISE appeared to be nervous and fidgety. Agent Fleming did not see any calls from a phone number with a 202 area code.

24. Agent Fleming explained to WISE that just because the gun was on lay-a-way with a no refund policy was not a reason to put the incorrect address on a 4473. Fleming advised WISE that not only had he committed two felonies every time he put the wrong address down on each of the previous 4473s, he just committed two more felonies by putting the wrong address on the 4473 during the acquisition of this latest firearm. WISE stated that he did not realize the significance of putting the wrong address on the form, but needed to buy the gun so he could sell it back to the store. Agent Fleming seized the firearm and WISE immediately asked if he could take the gun back into the store to get his money back. Agent Fleming answered "No".

25. Agent Fleming detected the odor of marijuana coming from WISE. WISE was asked whose car he was driving. He said it was his. He was then asked if there were any guns or drugs in the car. WISE falsely said, "No". Agent Fleming also needed to identify the occupants of the vehicle. The right front passenger was found to be CM. Agent Fleming could smell the odor of marijuana coming from CM. CM admitted to having smoked marijuana earlier in the day and attributed the smell on him as coming from the coat he was wearing as he was also wearing it at the time he smoked the marijuana. A quick pat down was conducted and no marijuana was found on CM's person. When asked if there was any marijuana in the vehicle, CM said, "No".

26. Agent Fleming then opened the right rear door and could smell a strong odor of marijuana. Agent Fleming asked the right rear passenger to step out of the vehicle. The passenger just looked at the agent. Agent Fleming then asked the passenger a second

12

time to step out of the vehicle. The passenger again just looked at the agent. Agent Fleming then told the passenger that if he did not get out of the vehicle, that he would be removed from the vehicle and arrested for obstruction of justice. Agent Fleming then asked the passenger to step out of the vehicle and he reluctantly complied. The right rear passenger was found to be GT. GT smelled of marijuana, and a pat down was conducted; no marijuana was found on his person. GT was very talkative in the form of claiming police harassment. He pulled out his cell phone and videoed the agents as they went about their job.

27. The left rear passenger was found to be KS. She stated that she had just gotten off of work at the Golden Corral in Colonial Heights, Virginia. No pat down was needed, nor conducted as she was wearing very tight fitting clothing.

28. Agent Fleming informed WISE that marijuana had been detected on three out of four passengers, as well as a strong odor of marijuana in the car and that CM had admitted to smoking marijuana earlier in the day. WISE was again asked if there was any marijuana in the car. WISE falsely replied, "No". WISE was asked what he would say if Agent Fleming asked for consent to search the car. WISE stated that they had places to go and he would say no. Agent Fleming then advised WISE that marijuana had been smelled, it was illegal in Virginia and the law allowed for a search of the vehicle. WISE was still nervous and fidgety in appearance.

13

29. As Agent Fleming was about to search the vehicle, WISE ran around to the right front passenger side area and appeared to be frantically trying to get into the glove compartment. Agent Kcraget and Officer E.L. Allen with the Colonial Heights Police Department told him to stop. WISE continued, despite the officer's commands and opened the glove compartment and reached in. Agent Kcraget grabbed WISE's hand and Officer Allen pulled his gun out in case WISE was trying to obtain a weapon. WISE said he was cold and was needing to get his face mask out of the glove box. It was not cold enough to warrant needing to wear a face mask.

30. Search of the left front, left rear and right front revealed nothing, but the odor of marijuana was still present. While searching the right rear, nothing was found, but the odor of marijuana was nearly overwhelming.

31. Access to the trunk was difficult to obtain. The trunk button on the dash did not work, the button on the trunk did not work and the trunk button on the key fob did not work. WISE was asked how to get the trunk open. WISE falsely said it could not be opened and was adamant that the lock was broken. WISE falsely stated that he had a large audio box speaker installed in the trunk of the car and when the installer closed the trunk, it broke or did something with the lock and he has not been able to open the trunk since.

32. Agent Fleming checked the car's owner's manual and was able to access the trunk by letting the rear seat down. Upon doing so, the odor of marijuana got even stronger. The agent could see a striped backpack that was wedged between the interior right side of the

14

trunk and a large speaker. Agent Fleming was able to maneuver the speaker out of the way enough to be able to get the bag out through the rear seat access. The bag was found to be a "Burberry" brand bag. Inside was a quart glass jar that contained a zip lock bag that contained the "buds" of a green plant material. The jar was sealed with a lid and ring. Also in the same compartment of the bag was a digital scale. Agent Fleming could see a second bag in the trunk. That bag was removed through the rear seat access and found to be a "MCM" brand bag. Inside of that bag was a quart glass jar that contained a zip lock bag that contained the "buds" of a green plant material. The jar was sealed with a lid and ring.

33. Access to the trunk was still not able to be obtained. WISE was told that the car was going to be towed, a search warrant was going to be obtained and the trunk lid would be cut off if need be. WISE then informed Agent Kcraget that there was a switch in the glove compartment that when turned off, it deactivated all buttons that allowed access to the trunk. WISE suggested that the switch may have somehow been inadvertently turned off or hit by the agent as the glove box was searched. Agent Fleming checked the glove compartment and found the switch. It was in the off position. It was then that the officers realized why WISE tried to diligently to get into the glove compartment. It was not to obtain the face mask, but rather to deactivate the trunk control switch. Once the button was turned on, the trunk button on the key fob worked to open the trunk.

34. As Agent Fleming searched the trunk, Agent Kcraget returned each of the passenger's identification (ID) cards and Agent Fleming told all of the passengers that the car was

staying until the search was over, but they were free to leave. Nothing else of an evidentiary nature was found in the trunk except for a FedEx envelope that contained multiple documents belonging to WISE.

35. During the course of the evening's events, Agent Fleming told WISE multiple times that he was not under arrest and was free to leave. WISE elected to stay around. Agent Fleming asked WISE if he would have a seat in the right front passenger's side of the agent's vehicle. WISE did so. WISE was asked if his ID had been returned to him. He checked and found that it had. Agent Fleming asked if he could see the ID Card. WISE complied and handed the ID to the agent. Agent Fleming wrote down WISE's information and asked for his Social Security Number, but WISE would not provide that number. Agent Fleming returned WISE's ID card to him.

36. WISE was told that he was not under arrest, was not going to be arrested at that time and that he was free to leave. WISE elected to stay seated in the truck. It was again explained to WISE that the firearm he had just purchased had to be seized because he had just committed two felonies by putting the wrong address on the form he filled out, especially after he had been advised of the violation a few days before. WISE said he understood. WISE was again asked about the earlier statement he made about placing a call to Agent Fleming. WISE said it was to check on the status of his Taurus Model PT 111M, 9mm semi-automatic pistol that was in ATF custody and had nothing to do with the current firearm purchase.

37. WISE said he bought the gun because the store has a policy that they will not refund any money after a deposit has been paid. WISE stated that he had already paid 90% of what it cost so he was buying the gun so he could take it back and get most of his money back.

38. WISE was told that he could continue to lie about it if he wanted to, but the Agents knew that what he did in the glove compartment ruse in order to get into the glove compartment so he could activate the switch so as to not allow access to the trunk. WISE did not reply at first, but later said he did not hit the switch.

39. Agent Fleming reviewed the contents of the "Burberry" brand bag with WISE. WISE said, "Where did all of that come from?" Agent Fleming reviewed the contents of the "MCM" brand bag with WISE and asked what he knew about the contents of the two bags. After a long pause, WISE falsely said he did not know anything about a scale, nor why any of that would be in his trunk. WISE falsely said he didn't know, and furthered it didn't make sense for him to come there with that.

40. When asked if his fingerprints were going to be on the jars or on the scale, WISE said he could not say they would not be on there. When asked if his DNA would be on any of these things, WISE replied, "It is". WISE was told that selling marijuana was not the crime of the century. WISE stated that he does not sell marijuana. He said he "don't sell nothing...no guns, no drugs or anything".

41. When asked what the purpose of having the marijuana was, WISE said he does occasionally smoke marijuana. He continued that every now and then he gets stressed out and has to smoke it. He said he is not addicted to it. He stated that this marijuana was given to him as a graduation gift while he was in Washington DC. He said he last smoked marijuana in early to mid-October of 2016 when he was in DC. He explained that he does not sell marijuana and this marijuana is not for sale. When asked what the purpose of the digital scale was, WISE stated that he uses the scale to be able to balance out what he smokes so that he does not smoke too much. He said it is something for him personally because he is an organized person.

42. WISE was asked how long he had been smoking marijuana. He replied, "Not long cause I really don't do it". When asked where he got the marijuana, he said, "DC". When asked how much he paid for the marijuana, he said, "It was a given to me". When asked what the quantity is, he said he did not know and continued that "it was supposed to be a graduation gift and I don't really smoke it". When asked when he last smoked marijuana, WISE said it was in early to mid-October back when he was in DC. When asked who the "Burberry" brand bag belonged to, WISE said "They're both my bags".

43. There was a packet of tobacco in the "Burberry" brand bag. Agent Fleming asked what that was. WISE replied that it was tobacco. When asked if he wanted it, Wise said he did. The tobacco was given to him. There was also a Versace pamphlet in the "MCM" brand bag, that WISE wanted as well.

18

44. WISE was asked when he picked the marijuana up.  He said he got back from Australia

on December 3, 2016 and he picked it up after that.  WISE had $318.00 in U.S. Currency

in his pocket that was seized as evidence/proceeds.


45. WISE had an iPhone 7 and he was asked if it contained any text messages or pictures that

pertained to drug or firearms trafficking.  He said it did not.  WISE provided the phone

and passcode with the anticipation that it would be gone through at the scene and his

phone would be returned to him there.  He signed a consent to search form for the phone.

Due to the sheer volume of pictures and text messages, there was no way that the agents

could go through the phone in a reasonable amount of time.  It was explained to WISE

that he could extend his consent to search the phone away from the scene and he could

possibly get it back the following day or if a warrant had to be obtained, it may take

several days.  It was entirely up to him how he wanted to handle it.  He elected to go with

consent so as the phone could be returned in a timelier fashion.


46. WISE said, "I just want you all to know I really appreciate what y'all are doing because

you don't really see this coming too much from a biracial situation.  I like that you are

talking to me and letting me know what's going on instead of just locking me up and

putting me away without even…".  He further stated, "I understand what y'all were

saying about the address.  I apologize because I didn't take heed or comprehend it fully".


47. On December 13, 2016, a Virginia State Police Special Agent attempted to download the

contents of WISE's phone.  The only contents that could be viewed were the

19

photographs. All text messages and other data was encrypted and protected by a secondary passcode. Agent Fleming called WISE to ask for the secondary passcode. WISE stated that the passcode had been programmed by the person at the phone store where he bought the phone and he does not know the passcode.

48. Several of the photographs on WISE's phone are, of what appears to be, the use of and selling of marijuana, along with a photograph of multiple firearms and photographs of large amounts of U.S. currency.

49. The amount of marijuana in the "Burberry" brand bag was approximately 30 grams weighed in the zip lock bag in which it was contained. The amount of marijuana in the "MCM" brand bag was approximately 14 grams weighed in the zip lock bag in which it was contained. Once the digital scale lid was opened, the weighing platform had marijuana residue all over the top of it.

50. The 2015 Nissan Altima that WISE was driving was registered to C.Y.R. of 3501 Carpenter Street SE, Washington, DC 20020. That is the current address listed for WISE on his driving transcript in the files of the Virginia Department of Motor Vehicles. The transcript shows a previous address of 214 N. Dunlop Street, Apartment 108, Petersburg, Virginia. His address was changed to the Washington, DC address on September 28, 2016. WISE still possesses and presents a Virginia Identification Card with the 214 North Dunlop Street address on it. That is the identification that WISE had presented to Dance's Sporting Goods in connection with the acquisition of the firearms. If he

20

presented a D.C. ID or listed a D.C. address on the 4473, the sale of the handgun could

not go through as per 18 U.S.C. 922(b)(3); 27 CFR 478.99(a).

51. The firearm WISE purchased on December 12, 2016 was a Zastava, Model PAP M92PV,

7.62 x 39, AK style semi-automatic pistol bearing serial number M92PV064578 which is

imported by Century International Arms in Georgia, Vermont.  WISE also purchased two

boxes of Wolf 7.62x39mm ammunition.  The firearm and ammunition were taken into

ATF custody.

52. On March 14, 2017 at 12:40PM, Agents T. Fleming and B. Kcraget spoke with CM to

discuss his observations of WISE.  CM said he has known WISE for two years.  CM

stated that he did not know that the marijuana was in WISE's car.  CM has not seen

WISE with any guns.  CM has not purchased any marijuana from WISE, but did smoke

marijuana with WISE on the VSU Campus two to three times over the last year.

53. On March 27, 2017 at 11:20AM, Agent T. Fleming and Detective R. Ferguson went to

the Petersburg Lofts Apartments located at 214 North Dunlop Street in Petersburg,

Virginia.  Regional Manager HN stated that WISE was evicted from Apartment 108 in

September of 2015 due to damage to the Apartment caused by WISE's dog and also due

to the frequent odor of marijuana that was emitted from WISE's Apartment.

54. HN stated that there was frequently a strong odor of marijuana in and around WISE's

apartment.  HN advised that WISE denied smoking marijuana and told her that the smell

21

was from a Hookah. HN said WISE would have "piles" of cash lying around in the apartment. HN stated that WISE's last day in apartment 108 was on September 30, 2015.

55. HN indicated that the apartment remained vacant until TB and MS moved into apartment 108 in January 2016. The two lived in 108 until their apartment suffered some damage from the outside and they then requested to be relocated to an apartment off of the ground floor so no one would be able to break into their apartment through the ground floor windows.

56. On March 27, 2017 at 11:49AM, Agent T. Fleming and Detective R. Ferguson spoke with TB. Agent Fleming showed a photo of WISE to TB. TB said she knows WISE as "Q" and that he is from DC. TB and her roommate moved into apartment 108 for approximately 11 months before moving into another apartment in December 2016. TB stated that "Q" never lived with her or her roommate after they moved into apartment 108 and "Q" did not spend one night in the apartment with them.

57. On March 27, 2017 at 3:20PM, Agent T. Fleming and TFO R. Ferguson spoke with MS. Agent Fleming showed a photo of WISE to MS. MS said she has seen him before on campus at VSU. She did not associate with him. He did not live with her and TB. He did not spend any nights with them. She knows that he lived in apartment 108 before they did.

58. On June 8, 2017, ATF Agents arrested WISE based on the outstanding federal arrest warrant. Agent Fleming noticed that WISE had an odor of marijuana about his person. Agent Donovan was not at the scene of WISE's arrest, but later met up with Agent Fleming and assisted with transporting WISE to the U.S. Marshal's Office. Agent Donovan had to get close enough to WISE in order to be able to remove the restraints, to fingerprint and to collect DNA from WISE. Agent Donovan noticed that WISE had an odor of marijuana about his person.

59. The cell phone that was found in WISE's possession during the search incident to arrest was a white and rose colored Apple iPhone with the Model Number: MN8P2LL/A, Serial Number: F71SJF9CHG74; IMEI Number: 35 916407 784048 7; and MEID Number: 35916407784048. Based on my training and experience, and also in consideration of the images found in WISE's cellphone during the prior consensual search specified above, it is known to me that there are most likely text messages, call logs, and photographs which constitutes evidence of the violations charged in the pending Indictment for which WISE has committed stored within the cell phone.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

1.      Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

23

2.      *Forensic evidence.* As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used it and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24

3.      *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e) (2) (B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device to human inspection in order to determine whether it is evidence described by the warrant.

4.      *Manner of execution.*  Because this warrant seeks only permission to examine the Device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

5.      If law enforcement is unable to extract information from the SUBJECT DEVICE due to not knowing the passcode, the SUBJECT DEVICE will be sent to Cellebrite who will attempt to determine what the passcode is.  Cellebrite uses trade secrets in order to be able to gain access to information in the cellular phone, the specifics of which are not known.  If Cellebrite can determine the passcode, the SUBJECT DEVICE and the passcode will be returned to ATF for the ATF, or its designee, to conduct the extraction.

6.      It is further requested that the search warrant provide authorization for agents of the ATF, or their designee, to search the above-listed devices and/or associated peripheral equipment (including by way of example but not limitation, subscriber identity module (SIM) cards, removable storage media, and/or paired or synced devices), for the evidence listed in the affidavit and warrant using a range of data analysis techniques. However, in some cases, the cellular communication devices may be damaged beyond repair, password protected and/or otherwise inoperable and less

25

invasive data analysis techniques will not accomplish the forensic goals of the examination. In these cases, an analysis technique referred to as "chip off" may be implemented to conduct the data extraction process. Chip-off is an advanced digital data extraction and analysis technique which involves physically removing flash memory chip(s) from a subject device and then acquiring the raw data using specialized equipment. This process could render the cellular communication device unusable. Additionally, other more forensically complex data analysis techniques may be utilized and employed by Cellebrite. Cellebrite is a global company that further augments existing agency resources with bleeding-edge, best-in-class processes and technical resources to help solve complex mobile forensic investigative challenges.

## CONCLUSION

I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the SUBJECT DEVICE described in this affidavit to seek the items described in Attachment A.  Based on the above described events, there is probable cause to support a finding the items listed in Attachment A are likely presently concealed in the SUBJECT DEVICE, which constitute evidence of violations of 18 U.S.C. § 922(a)(6), 18 U.S.C. § 922(g)(3), 18 U.S.C. § 1001 and 18 U.S.C. § 922(k).

FURTHER SAYETH NOT.

John C. Donovan, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me this _____ 30th _____ day of June, 2017, in Richmond, Virginia.

/S/
David J. Novak
United States Magistrate Judge

27